■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUAN MATIAS, Appellant.—Judgment of the Supreme Court, New York County (P. Bernheim, J.), rendered September 29, 1983, convicting defendant, after trial by jury, of murder in the second degree (Penal Law § 125.25 [1]), and sentencing him to an indeterminate term of 20 years to life in prison, is affirmed.

The facts are fairly stated in the dissent. We note, however, that the empty knife case found in defendant's apartment was, contrary to the conclusion reached by the dissent, properly admitted into evidence. Circumstantial evidence requires only that it "have relevance, that it tend to convince that the fact sought to be established is so. That it is equivocal or that it is consistent with suppositions other than guilt does not render it inadmissible" (*People v Yazum,* 13 NY2d 302, 304). Physical evidence is admissible where it is sufficiently connected with the defendant to be relevant. "If it is not so tenuous as to be improbable, it is admissible as is any other evidence which is relevant to an issue in the prosecution" (*People v Mirenda,* 23 NY2d 439, 453).

The knife case was clearly connected with defendant since it was recovered in his apartment. It was relevant because the victim had been stabbed with a knife which one witness described as a "buck knife," six inches long when folded. The introduction of the empty case permitted the jury to determine for itself whether the knife described as the murder weapon could have fit into this case. Moreover, since none of the other knives found in defendant's apartment fit into the empty case, the jury could infer that the case once held the knife which defendant was carrying when he stabbed the victim and then discarded. Although other inferences could be drawn, the admissibility of this evidence was not dependent upon a showing that it permits of only one inference, as would a conviction based solely on circumstantial evidence (*People v Mirenda, supra,* p 453). Rather, it is admissible so long as it tends to establish defendant's guilt or innocence. This test was met. *People v Jones* (62 AD2d 356) and *People v Galletti* (55 AD2d 154), cited by defendant, are inapposite. Both of these cases involved the introduction into evidence of large quantities of cash found on the defendant at the time of arrest which suggested uncharged drug sales. In *People v Rivera* (88 AD2d 892), a wristwatch was introduced which the defendant had discarded as the police approached. Since it did not belong to the robbery victim, it suggested evidence of an uncharged robbery. In *People v Kitchen* (55 AD2d 575), the prosecutor,

among numerous other errors, displayed a revolver in a murder trial without either connecting it to the crime or, apparently, offering it into evidence. Thus, none of these cases even remotely approaches the facts herein.

Even if the court erred in admitting the knife case into evidence, such error must be deemed harmless. Defendant did not object to testimony about the knife case by a detective. Likewise, defendant did not object to the arguments concerning its significance which were part of the prosecution opening and summation. Thus, defendant cannot fairly argue that the actual introduction of the case into evidence harmed him in any way. The jury knew of its existence and had heard testimony about what it looked like. Its admission merely permitted them to see it. The evidence that defendant intentionally killed the victim was overwhelming, consisting of the corroborated testimony of an eyewitness to the stabbing and the defendant's own admission to his girlfriend that he stabbed the victim. Given the overwhelming credible evidence, introduction of the knife case, even if error, was harmless.

Finally, the trial court's response to the jury's request for additional instruction on intent was complete and correct. After some deliberation, the jury made three requests for further instruction and one request for testimony. Its fifth request was for a definition of intent and what the People "[have] to do to prove intent." The court responded fully to that request. After the jury had resumed its deliberations, defense counsel complained that the jury should have been reinstructed on the People's burden of proving the element of intent beyond a reasonable doubt. The jury had, however, repeatedly been instructed by the trial court on the People's burden of proof. Since the jury raised no question as to the burden of proof on this element of the crime, it can be concluded that it well understood that the People had the burden of proof beyond a reasonable doubt.

We have examined defendant's remaining contentions and find them to be without merit. Concur—Sullivan, J. P., Asch and Bloom, JJ.; Fein and Milonas, JJ., dissent in a separate memorandum by Milonas, J.

Milonas, J. (dissenting). In my opinion, the judgment herein should be reversed and the matter remanded for a new trial.

According to the People's case, 16-year-old Luis Alberto Roman was one of some 20 to 30 members of a street gang known as "AZ" or "Always Zooted". Roman's older brother, Luis Angel Roman, called "Louie", attended school, held a

part-time job and did not belong to the group. Lisa Gonzalez, who lived in the same Lower East Side neighborhood, had dated various members of the AZ gang. In March of 1983, she was seeing defendant Juan Matias, a member of "CBS" or the "Can't Be Stopped" gang. Gonzalez encountered the defendant on the evening of March 16, 1983 as she was on her way to the store to perform an errand for her mother. He suggested that they proceed to Eighth Street to confront a couple of girls who he claimed were "saying things" about her. The defendant arranged for a number of other CBS members, including someone named "Londie", to accompany them in the event that the guys from AZ decided to "try something".

When the defendant, Gonzalez, Londie and the other CBS gang members arrived at Eighth Street, Roman was there. Defendant thereafter asked a girl named April, who had supposedly said some "nasty" things about Gonzalez, to speak with Gonzalez. In the meantime, Londie was getting embroiled in a fight with a certain Angelo, who did not belong to either CBS or AZ, and a shot was fired. The defendant started running away, but he was chased by Roman. After catching up with the defendant, Roman threw him to the ground, hit him and removed two silver chains from around his neck. The defendant then escaped the scene.

The prosecution's witnesses further testified that the following day, Roman and Louie went to school. Louie left about noon and subsequently met Manuel Soto near Eighth Street and Avenue D. The two boys began walking in the direction of Orchard Street to look at clothes. As they approached Houston Street, they noticed that a CBS member was following them and that other CBS members, including the defendant, Alex and Rico, were positioned across the street. Louie and Soto attempted to return to their own turf but they were stopped by the CBS, and Louie was beaten up while Soto was prevented from coming to his friend's assistance by one of the CBS. After the assault had been completed, Soto helped Louie up, and they headed back toward Eighth Street. The boys were nearing Sixth Street when the defendant and Rico appeared behind them. The defendant stabbed Louie in the stomach with a brown and gold folding knife, or "buck knife", which was about six inches long when folded. Soto then carried Louie for two blocks until they reached Eighth Street where Soto deposited his friend on a bench and hurried to summon the police and an ambulance.

Louie, however, died of his wounds, and the medical examiner later determined that the cause of death was a stab

wound to the abdomen which penetrated the abdominal wall, pancreas, liver and then severed the aorta at two separate points. The deceased also had abrasions over the forehead and right eyebrow, bruises to the lower lip, a laceration of the upper lip and a deep stab wound to the bridge of the nose approximately one and one-half inches deep. On the evening of the stabbing, two detectives visited Lisa Gonzalez's apartment. After they had departed, she received a telephone call from the defendant who, in response to Gonzalez's inquiry, admitted responsibility, stating, "Look, you know, they shot you know, my [hombre] Londie. I didn't know what I was doing, and, you know, I stabbed him." On March 22, 1983, New York City Housing Detective James Pinder executed a search warrant for the defendant's apartment at 601 East 11th Street. He discovered a knife and, in a different room, a knife case. The knife did not fit the case, and all the other knives in the apartment were of the kitchen variety.

At trial, the defendant testified on his own behalf that on March 16, 1983, he and his girlfriend had gone to Eighth Street to discuss what her former boyfriends in the AZ gang had done to her. No one else accompanied them. Approximately 15 members of AZ were there, sitting around a park bench. There were also several girls present. Defendant became embroiled in an argument with one of the girls, and an AZ member rose to her defense. Just then defendant's friend, Orlando Martinez, known as Londie, came by on his bicycle, and he got into a fist fight with a person named Angelo. In the meantime, someone called Edwin left, went into a nearby building and returned with a shotgun, which he pointed at defendant and shot at Londie. While the defendant was on the ground, Angelo kicked him and Manuel Soto grabbed his chains. Londie was subsequently taken to the hospital where he remained for about two weeks recuperating from his injuries.

The next afternoon, the defendant was in the company of three other CBS members, Rico, Al and Terry when he noticed Louie and Soto walking down Avenue D. The defendant crossed the street to meet them and then got involved in an altercation with Louie over the mistreatment accorded the defendant's girlfriend. Since Louie declined to fight, the defendant pushed him and invited him to a nearby school yard to settle their differences. They thereafter proceeded to the school yard where, with no one else in attendance, they began fighting. The defendant struck Louie, knocking him to the ground. As Louie fell, 11 shotgun shells dropped out of his

pocket. The defendant ordered Louie to remove his hands from his pocket, and Louie complied, pulling out a knife. Louie tried to attack the defendant with the knife, but the defendant hit him, and this caused Louie to let go of the knife. Both of them grabbed for the weapon, and, in the ensuing struggle, the knife plunged into Louie's stomach. The defendant picked up the knife and threw it into an abandoned building as he ran from the scene. He denied having spoken to Gonzalez after the stabbing and insisted that the knife case which Detective Pinder took from his apartment belonged to his stepfather. He also identified a silver chain which had been entered into evidence as one that had been wrested from him by Soto on the night of the shooting.

In rebuttal, the People called Armat Watson, a member of the CBS gang, who stated that on March 17, he saw Louie being beaten by, among others, the defendant near P. S. 188. When a Puerto Rican man attempted to break up the fight, Louie fled, dropping shotgun shells as he made his escape. Moreover, Housing Police Officer Jaime H. Gonzalez testified that on March 18, 1983, he visited Roman's home and was given a silver chain which the latter claimed to have taken from the defendant two days earlier.

The court, over defense counsel's objection, admitted into evidence the knife case discovered in the defendant's apartment shortly after the incident in question. There was, however, no proof whatever connecting this scabbard to the brown and gold folding knife used in the stabbing. There was no evidence that the case was designed to accommodate a folding knife or a fixed blade knife or that the knife could even fit into this particular case. The law is well settled that the relationship of a particular item to a case must be sufficiently established before it can be deemed relevant. (*People v Mirenda,* 23 NY2d 439.) Evidence is relevant " 'if it is legally probative of some matter to be proved' " (*People v Jones,* 62 AD2d 356, 357; *see also, People v Galletti,* 55 AD2d 154). Where, as in the situation herein, the prejudicial effect of the evidence far outweighs any conceivable relevance, the item involved should not be placed before the jury. (*See, People v Thornton,* 104 AD2d 426; *People v Rivera,* 88 AD2d 892; *People v Kitchen,* 55 AD2d 575.) Indeed, the only purpose of showing the scabbard to the jury was to convince its members that the case had once housed the knife used to stab the deceased. The prejudicial impact of this evidence was compounded when the prosecutor relied upon it in summation with devastating effect, concluding without any basis therefor that the exis-

tence of the knife case proved that the fatal knife belonged to the defendant. The inevitable result could only have been to undermine totally the defendant's credibility with respect to the version offered by him of the events surrounding the death of Luis Angel Roman. According to the District Attorney: "There is a knife missing here. Because we have a case for a knife and we don't have the knife that fits into it. Detective Pinder searched the defendant's apartment, he found a case for a knife and he found a knife in a different room. That, no question, belonged to the defendant's step father. But that knife doesn't fit in that case. Where is the knife that fits in that case? You know where that knife is. The defendant threw it away. He told you I threw it in an abandoned building. But the poin[t] is, it was his knife. If it was [the deceased's] knife, then we should have the knife that fits the case. We don't. We don't because it was the defendant's knife".

In addition to the erroneous admission of the scabbard, the court failed to provide complete and correct instructions to the jury in response to its inquiry concerning "the legal definition of intent and what the Prosecut[or] has to do to prove intent." It simply reiterated the Penal Law definition and advised the jury that intent could be established circumstantially. Although it is evident from the record that the jury was experiencing some difficulty in deciding between second degree murder and first degree manslaughter and were thus seeking clarification of the concept of intent, the court declined to give the supplemental charge urged by defendant's attorney or to further elaborate the matter. (See, CPL 310.30.) Pursuant to CPL 310.30, the trial court "is vested with some measure of discretion in framing its response and is in the best position to evaluate the jury's request in the first instance. But that discretion is circumscribed, as under the prior code provision, by the requirement that the court respond meaningfully to the jury's request for further instruction or information" (People v Malloy, 55 NY2d 296, 302). In conjunction with the improper admission into evidence of the knife case, the court's failure to furnish an adequate supplementary charge regarding the issue of intent was not harmless error.